**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SARAH CHINA MORGAN,                                    Case No. 1:17-cv-107

          Plaintiff,                                    Black, J.
                                                       Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Sara Morgan filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error for this Court's review.[1] As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

### I.  Summary of Administrative Record

In April 2011, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning August 28, 2008,[2] based upon a combination of physical and mental impairments. In this appeal, Plaintiff asserts that she simultaneously filed an application for Supplemental Security Income ("SSI"). As explained below, the record does not support that assertion.

---

[1]Although Plaintiff's Statement or Errors identifies four claims rather than three, two of the claims are so closely related that they have been combined for the convenience of this Court.
[2]The record reflects a prior DIB application that was electronically filed and denied in 2009.  (Tr. 156).

After her DIB claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an administrative law judge ("ALJ"). On January 7, 2013, Plaintiff appeared with counsel and gave testimony before ALJ Gilbert Sheard. During the hearing, both a medical expert and a vocational expert also testified. (Tr. 47-107). On March 18, 2013, ALJ Sheard issued an adverse written decision, concluding that Plaintiff was not disabled. (Tr. 204-221). However, on appeal, the Appeals Council vacated ALJ Sheard's decision after finding that he had not correctly utilized the testimony of the medical expert ("ME"), but instead had questioned the ME in a manner that "suggested specific conclusions and was in [legal] error." (Tr. 230). Specifically, ALJ Sheard erred by asking the ME to determine the claimant's residual functional capacity ("RFC") rather than making that determination himself as required by controlling regulations. (Tr. 231). ALJ Sheard also erred when he asked whether the claimant "would like to settle with the government for a closed period [of disability] dated July 31, 2010 and ending August 1, 2012," suggesting that a "settlement does not have to be rational much less supported." (Tr. 79). As the Appeals Council held, "[s]uch statements are inappropriate because any finding that pertains to the ultimate question of a claimant's disability must be based on the Administration's regulations, policies, and substantial evidence, not on a settlement or negotiation." (Tr. 231).

The Appeals Council remanded the matter to a new ALJ to conduct a new hearing, to obtain new medical expert testimony "if necessary," and to obtain "supplemental evidence from a vocational expert" that would include hypothetical questions that reflected an RFC as determined by the new ALJ, based upon the record as a whole. (Tr. 231). Two years after ALJ Sheard's decision, on March 12, 2015, ALJ

Kristen King conducted that second evidentiary hearing, at which Plaintiff again appeared with her attorney and gave testimony. A vocational expert also testified, but no additional consultative examinations were conducted, nor was new medical expert testimony received. On October 28, 2015, ALJ King filed a written decision that again concluded that Plaintiff was not disabled. (Tr. 17-34).

In her 2015 decision, the ALJ found that Plaintiff was 38 years old, and still a "younger individual age 18-44" on the date that she was last insured, which was September 30, 2013. (Tr. 20, 32). The ALJ determined that Plaintiff has the following severe impairments: "Depression, bipolar disorder, posttraumatic stress disorder (PTSD), intermittent explosive disorder, borderline intellectual functioning, obesity, diabetes, osteoarthritis, and hernia." (Tr. 20). However, none of these impairments met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpt. P, Appx. 1. (*Id.*).

Plaintiff has a high school education and lives with her two children. The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a restricted range of sedentary work, subject to the following limitations:

> She can never crawl or climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, or climb ramps or stairs; and she must avoid all use of dangerous machinery including no commercial driving and all exposure to unprotected heights. She is limited to occupations that require only occasional verbal communication or occasional telephone communication. She is limited to simple, routine, and predictable tasks. She can perform goal-oriented work, but no constant production rate pace work such as an automated assembly line. She can interact with the public no more than approximately 10% of the workday, but no transactional interaction such as sales or negotiations. She can only occasionally interact with coworkers and supervisors, but with no tandem tasks. She cannot work in situations where she needs to resolve conflict or maintain a friendly or persuasive demeanor. She is limited to work with no strict time limits or production standards.

(Tr. 23).  In making these findings, ALJ King rejected Plaintiff's contentions that she was disabled based upon various physical impairments, including fibromyalgia (which the ALJ did not find to be a severe impairment), and/or that Plaintiff met listing level severity based on her limited intellectual functioning.

Considering Plaintiff's age, education, work experience and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a significant number of jobs in the national economy, including the representative jobs of clerk, assembler, inspector, and packer during the alleged disability period.  (Tr. 33). Therefore, the ALJ determined that Plaintiff was not under a disability prior to September 30, 2013.  Plaintiff again sought further review from the Appeals Council, but this time, the Appeals Council denied further review.  Therefore, ALJ King's decision remains as the final decision of the Commissioner.

In her appeal to this Court, Plaintiff argues that the ALJ erred: (1) in failing to issue any ruling at all on Plaintiff's SSI application or making a determination of disability *after* Plaintiff's date last insured ("DLI"); (2) in failing to fully correct the errors made by ALJ Sheard, and improperly evaluating medical opinion evidence at Steps 4 and 5 of the sequential analysis;[3] and (3) in failing to recognize migraines and Plaintiff's panic attacks as "severe" impairments at Step 2 of the sequential analysis.  The undersigned finds no reversible error.

---

[3]Plaintiff's Statement of Errors divides this claim into two, focusing on the alleged failure to "remedy the errors found by the Appeals Council" relating to medical opinion evidence (Doc. 12 at 13), and specifically, in improperly assessing the opinions of Dr. Cerullo.  (Doc. 12 at 16).

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits

5

analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

## B.  Relevant Testimony By Plaintiff

Prior to turning to the three claims that Plaintiff presents to this Court, the undersigned notes that Plaintiff does not challenge the adverse credibility finding made by the ALJ. (*See* Tr. 24-27). The issue is generally relevant to the analysis of the record as a whole.[4] It is also relevant because Plaintiff's brief to this Court emphasizes Plaintiff's history of low earnings and part-time work as proof that she is incapable of

---

[4]Four pages in the Statement of Errors are devoted to Plaintiff's testimony about the allegedly disabling extent of her limitations, but again, the ALJ did not find that testimony to be credible. (*See* Doc. 12 at 8-11).

full-time employment. (*See generally*, Doc. 12 at 5-6, recounting Plaintiff's "long history of mental illness and treatment" and low earnings from 1992 through 2008).

In contrast to her argument in this Court, Plaintiff testified that she only looked for part-time work not due to any disability, but "because I still had my boy at home and my daughter and so I didn't want to be away from home from them for a 40 hour week." (Tr. 60). When Plaintiff's counsel asked her if she could have worked full-time in 2009 if she had a job "where you didn't have to lift much," Plaintiff clearly responded "Yeah." (Tr. 62). Her attorney asked again whether she could work full-time if lifting were not an issue, if she considered not only physical limitations "but your mental problems too." (*Id.*) Again, Plaintiff responded "yeah, I think I could." (Tr. 63). Counsel persisted, asking if she thought she'd have "any problems with your mental conditions working a full time job?" (*Id.*) In response to this final clarifying question from counsel, Plaintiff responded that she could work full-time "[a]s long as I get home before dark." (*Id.*) Later in the same hearing, she testified that her paranoia symptoms would not affect her working a day job, except that she would not want to work in the same room as other people. (Tr. 85). When counsel asked Plaintiff when her symptoms of paranoia after dark began, she responded since "November of last year [2012]." (Tr. 64).

The second hearing occurred long after the expiration of Plaintiff's insured status. At that hearing, counsel described a hypothetical "easy eight-hour a day job, you know when you could sit or stand whenever you want to….*would that be a problem for you* – the drowsiness, the fatigue, if you –" Plaintiff responded "*No*, it [a diabetes medication] just makes me slow and twice a day I'm tired." (Tr.135, emphasis added). It is true that Plaintiff testified that other symptoms would be work preclusive, explaining that she fell asleep and that her back hurt her when she attempted to help her sister at work for 8

hours in October 2014.  (*See e.g.*, Tr. 136-137).  However, that date was more than a year after Plaintiff's DLI, and ALJ King stressed that most of Plaintiff's testimony "focused on her current state and not her issues prior to the date last insured."  (Tr. 27).

Aside from general arguments that her own discredited testimony supports her claim, Plaintiff advocates for reversal based upon three claims of legal error.  The first claim is not cognizable in this proceeding.

### C. Plaintiff's Claims of Error

#### 1. Plaintiff's Lack of Any Prior *Relevant* SSI application

The record before this Court reflects that Plaintiff timely appealed the denial of her April 2011 DIB application, but does not reflect any "concurrent" SSI application. Based on the documents in the administrative record, the undersigned recognizes a valid appeal of ALJ King's October 2015 written decision, which determined that Plaintiff was not under a disability prior to the expiration of her insured DIB status in September 2013.

Plaintiff's first claim of error does not concern the referenced denial of Plaintiff's DIB claim, but instead is based upon a new assertion that the ALJ failed to consider whether Plaintiff was disabled for purposes of **SSI**, after the expiration of her DIB insured status.   The issue is a critical one because there is evidence that Plaintiff's mental impairment worsened after the expiration of her insured status in September 2013, and many of the records that Plaintiff relies upon relate to that post-insured period.   Plaintiff concedes that her insured status expired on September 30, 2013. Therefore, unless the current judicial appeal also concerns an SSI application, Plaintiff was required to prove that she became disabled *prior to September 30, 2013*.

I conclude that Plaintiff cannot appeal the alleged failure to consider SSI disability because (1) there is no evidence that Plaintiff filed an SSI application in 2011, at the time that she filed her DIB application, such that the ALJ's decision involved (or should have addressed) the denial of both claims; and (2) the limited evidence in the administrative record suggests that the only prior SSI applications that Plaintiff filed were denied in 2010 and not appealed.

Plaintiff points to scant evidence in the record implying the existence of a simultaneous SSI application, including a generic statement on her electronic DIB application that indicates "I have filed or intend to file for SSI." (Tr. 385). However, the same internet application states "No previous application has been filed…by or for me." (*Id.*)

Two other forms relating to the initial processing and denial of her DIB claim contain very brief references to a prior SSI application. A July 28, 2011 initial denial of her DIB claim explains that <u>if</u> she has applied for other benefits, she will receive "a separate notice when a decision is made on that claim." (Tr. 242). After stating the determination that she remains capable of work for DIB purposes, the form adds this statement: "The application you filed for SSI was also a claim for Social Security benefits. We looked into whether you qualify for Social Security and found that you do not. If you disagree, you have the right to appeal." (Tr. 242). In addition, a January 12, 2012 form from the same DIB initial processing includes this cursory notation: "SSI involved. Appl date 03/18/10." (Tr. 388). As explained below, these cursory references appear to be to a prior SSI application that was filed a year earlier, in 2010, but was not appealed.

Plaintiff's counsel points out that in his prehearing memorandum to ALJ King, he referenced Plaintiff's current application as a "concurrent" claim, which he now argues was a reference to simultaneous DIB and SSI applications. (Tr. 578). However, in the same prehearing brief, counsel refers to Plaintiff's "prior application" dated March 18, 2010, with the "decision on prior app." listed as August 26, 2010. (Tr. 578, emphasis added). The contents of the prehearing brief address only the denial of the separate April 2011 DIB application.

The extremely cursory references to a presumed prior SSI application are not sufficient for Plaintiff to prove that she completed a new SSI application in 2011 with her DIB application, and/or that any SSI application is part of the same "final decision" that has been timely appealed to this Court under 28 U.S.C. §405(g). In fact, Plaintiff fails to point to any actual SSI application in the record aside from the 2010 application.

In the Statement of Errors filed in this Court, Plaintiff refers to applications for both DIB and SSI filed in December 2008, which applications were "denied and she applied again in March of **2010**." (Doc. 12 at 4, emphasis added) Distinguishing the earlier 2010 applications, Plaintiff's Statement of Errors clarifies that "[t]he *application* [singular] that gives rise to *this action* was made on April 8, 2011." (*Id.*, emphasis added).

The Commissioner persuasively argues that this appeal concerns only the April 2011 DIB application, and that no SSI application is at issue. In support, the Commissioner has submitted the Declaration of Myra Cryder, a Title 16 Technical Expert at the Chillocothe Field Office. Ms. Cryder's Declaration confirms that Plaintiff did not file a simultaneous separate SSI application when she submitted her DIB application via the internet in April 2011. In fact, an SSI application could not be filed on

10

the internet until 2017.   The field office advised Plaintiff in writing on at least three occasions that if she wished to apply for SSI benefits, she would have to submit a signed application to the field office.  (Doc. 15 at ¶¶ 3-4).  The three letters are attached to Ms. Cryder's Declaration as exhibits.  The affidavit further reflects that Plaintiff filed two erlier SSI applications on dates that do not correspond with her DIB application. Both of those applications were denied <u>and were not appealed</u>.   (*See also* Tr. 168).

The Commissioner's record of the date of Plaintiff's second SSI application (March 2010) and the date of the unappealed denial of that SSI application (August 2010) correspond with the dates of the "prior application" referenced in Plaintiff's prehearing brief before ALJ King.  (Compare Doc. 15 at ¶6 with Tr. 578).   Both ALJ decisions plainly discuss only Plaintiff's DIB application, and ALJ King's decision heavily emphasizes the expiration of her insured status in September 2013.   The fact that the limitation of the claim to Plaintiff's DIB application was deliberate is further supported by the first hearing transcript, which includes ALJ Sheard's reference to the (unappealed) prior SSI application, filed in March 2010 and denied in August 2010.  After improperly offering Plaintiff a "settlement" for a closed period of DIB, ALJ Sheard reminded Plaintiff's counsel that "you have to realize there you've got a res judicata in there, August, 2010."  (Tr. 81).  Plaintiff's counsel responds, with a query "You said August, 2010 res judicata?"  The ALJ responds again:  "[Yes] Res judicata was denied at the district level August 26, 2010," (*see* Tr. 81), again, corresponding to the denial date of Plaintiff's prior SSI application.

At the second hearing, when asked if he had anything else he wished to discuss, counsel made a vague allusion to what may have been the same (closed, prior application) SSI issue.

Attny:  Nothing to add to what I said at the opening.  Well, there's *a reopening question* –

ALJ:  Mm-hmm.

Attny:  *-- issue – date last insured issue*.  I don't like those in my M.O.  And you know, she's been by and large compliant and although her aggressiveness of her mental conditions has caused her problems in the past, she's by and large stayed out of trouble and not had any substance abuse problems….

(Tr. 150, emphasis added).  However, counsel did not elaborate or clarify what "reopening" issue he wished to raise, nor did he otherwise refer to SSI or articulate any SSI issue at any point during the administrative process, including but not limited to Plaintiff's request for further review by the Appeals Council.

In her reply memorandum, Plaintiff argues that this Court should not consider the Commissioner's Declaration and exhibits confirming that Plaintiff did not submit an SSI application on or about April 2011, when she filed her DIB application.  Without elaboration, she argues that she should be provided the opportunity to present her own evidence about "what she was told by SSA personnel about SSI."  (Doc. 16 at 2).  Again, Plaintiff does not point to any evidence that she completed an SSI application that would correspond with the 2011 DIB application that forms the basis for this judicial appeal.  The undersigned finds the Commissioner's Declaration to be properly submitted and cognizable in this proceeding, because it pertains to the accuracy and completeness of the administrative record before this Court.

In the alternative, the undersigned recommends denial of Plaintiff's attempt to raise an SSI claim because it is Plaintiff's burden to prove that she timely filed and administratively exhausted a concurrent SSI claim that would be subject to review by this Court.  The minimal evidence referenced by Plaintiff not only fails to carry that burden, but to the contrary, strongly suggests that she is attempting to improperly

reopen and belatedly appeal an SSI application that was filed in March 2010 and denied in August 2010. (*See also* Tr. 168, noting dates of prior closed applications).

Nor is there any basis to remand this case back to the agency to review whether or not social security agency personnel somehow misled Plaintiff into not completing a new SSI application at the time she filed her 2011 DIB application. Aside from arguing that she should be allowed to submit testimony to rebut the three separate notices she was sent regarding the SSI process (which she does not dispute receiving), any alleged negligence by field office personnel would not exempt Plaintiff from adhering to regulatory requirements regarding the completion of an SSI application. *See, e.g.*, *Jones v. Astrue*, 2013 WL 811804 (S.D. Ohio March 5, 2013) (plaintiff cannot estop agency from holding that his SSI application date was not filed concurrently with his DIB application), adopted (S.D. Ohio Sept. 29, 2013); *accord Colbert v. Com'r of Soc. Sec.*, 2009 WL 2059907, 143 Soc. Sec. Rep. Serv. 638 (S.D. Ohio July 9, 2009).

## 2. Alleged Errors on Remand by the Appeals Council

Plaintiff's second claim of error is that ALJ King failed to conform with the directions of the Appeals Council on remand, by failing to request additional evidence including a consultative examination, and by failing to obtain testimony from a new medical expert. She contends that the Appeals Council "essentially found that [all of] the medical opinions of ME Dr. Buban were unreliable because they were the product of ALJ Sheard's questions that suggested specific conclusions." (Doc. 12 at 13). She argues that the Appeals Council "unambiguously rejected [all of] Dr. Buban's opinions as the product of ALJ Sheard's suggestive questioning." (*Id.*) Based upon this interpretation of the Appeals Council's remand order, Plaintiff argues that any reliance on Dr. Buban's opinions at all by ALJ King constitutes reversible error.

13

### a. Whether Alleged Failure to Comply With Remand Order Constitutes Error

As a district court in Michigan recently noted, "[t]here is no consensus among federal courts regarding whether an ALJ's failure to follow Appeals Council directives in a remand order may serve as independent grounds for reversal, in the absence of some other error." *Kaddo v. Com'r of Soc. Sec.*, 238 F.Supp.3d 939, 943 (E.D.Mich., 2017). In *Kaddo*, the court held that "the failure by an ALJ to follow a remand order from the Appeals Council, even if that failure is allowed to stand by a later Appeals Council ruling, can constitute a reversible error in federal court." *Id.* at 944; *see also Reynolds v. Com'r of Soc. Sec.*, 14 F. Supp.3d 954, 966 (S.D. Ohio 2014)(holding that an ALJ's failure to follow the clear directive of the Appeals Council on remand is sufficient to support a reversal by the federal court).   In contrast to *Kaddo* and *Reynolds*, however, courts have concluded in many unpublished decisions that there is no jurisdiction to address whether an ALJ has complied with the Appeals Council's instructions on remand.  *See, e.g., Wyatt v. Com'r of Soc. Sec.*, 2017 WL 3224666 at *8 (S.D. Ohio July 31, 2017)(agreeing with the "majority view" that such issues are not cognizable in judicial appeal of an ALJ's decision after remand); *Hedges v. Com'r of Soc. Sec.*, 2017 WL 3140876 at *10 (S.D. Ohio July 25, 2017)(same); *Llaneza v. Com'r of Soc. Sec.*, 2016 WL 4054918 (S.D. Ohio July 29, 2016); *Shope v. Com'r of Soc. Sec.*, 2015 WL 3823165 at *9 (S.D. Ohio June 29, 2015); *Brown v. Com'r of Soc. Sec.*, 2009 WL 465709 at *6 (W.D. Mich. Feb. 24, 2009).

In her reply memorandum, Plaintiff argues that the Commissioner has mischaracterized her argument - that she is not seeking review of the Appeals Council's remand order but instead, is merely pointing to that decision as "evidence of the inadequacy of the medical evidence," since ALJ King did not solicit new medical

evidence to support the denial of the claim. (Doc. 16 at 2). To the extent that Plaintiff retreats from a claim that this case should be reversed solely based upon ALJ King's alleged failure to comply with the remand order, it is unnecessary to determine whether this Court would have jurisdiction to review that claim. Instead, the undersigned understands the claim as challenging whether there is substantial medical evidence to support ALJ King's nondisability determination in light of recognized infirmities in ME Dr. Buban's original testimony.

On the other hand, if Plaintiff is claiming error based on the ALJ's failure to obtain new medical expert testimony at the second hearing, the undersigned would reject that claim. Plaintiff is highly critical of the fact that another ALJ assigned to hear the case on remand had scheduled a new ME, but that when the case was reassigned to ALJ King, she did not schedule an ME to appear. It is worth noting that counsel expressly waived any possible error relating to notice that no ME would appear before ALJ King.[5] In any event, the language of the Appeals Council's remand order included no mandatory requirements to further develop the record, but instead directed the ALJ to obtain evidence from a new medical expert "if necessary." (Tr. 231). Considering that Plaintiff's date last insured was September 2013, that the first hearing was in January 2013, with the second hearing not held until nearly 18 months after the expiration of Plaintiff's DLI, the undersigned finds no reversible error based on the ALJ's failure to obtain new ME testimony. Plaintiff was invited by the new ALJ to submit new evidence to complete the record, and submitted nearly 400 pages of new evidence that was

---

[5]At the end of the hearing, counsel inquired about whether a "Dr. Rogers" was supposed to be at the hearing as a medical expert. ALJ King explained that was "originally scheduled" when the case was assigned to ALJ Debra Smith prior to her retirement, and that counsel should have received a notice that no ME was scheduled when the case was reassigned to ALJ King. (Tr. 151). Counsel acknowledged that he might have overlooked that notice, but that he did not object to any procedural error if he did not receive it. (Tr. 151-152).

considered by ALJ King, though she found much of it to be irrelevant to Plaintiff's level of impairment during the insured period that was at issue. (*See* Tr. 1194-1584).

### b.  ALJ King's Evaluation of Seven Medical Opinions

### i.  Dr. Buban's Testimony

Dr. Buban's January 2013 medical opinions were offered within eight months of Plaintiff's DLI, and encompassed her review of the medical records up until that hearing date.  In her reply, Plaintiff clarifies that the focus of her appeal is on ALJ King's continued reliance on ME Dr. Buban's testimony and opinions.  Plaintiff argues that the entirety of Dr. Buban's testimony was so inadequate and unreliable that it formed the basis for remand by the Appeals Council.  However, the Commissioner persuasively argues that only a small portion of Dr. Buban's testimony was rejected by the Appeals Council.

The Appeals Council found error in ALJ Sheard's provision to Dr. Buban of "a document containing numerous statements regarding a generic claimant" and request that Dr. Buban "'please personally initial the paragraphs that apply, and feel free to amend as appropriate; there is plenty of room in the margin for more' (Exhibit 33F, Hearing Log 12:20:34 pm to 12:21:20 pm)." (Tr. 230).  ALJ Sheard's conduct in this regard "suggested specific conclusions and was in error." (*Id.*)  Put simply, ALJ Sheard failed to determine Plaintiff's mental RFC as legally required, but instead suggested to Dr. Buban what limitations she should determine on the form.  Even if the ALJ had more properly solicited Dr. Buban's RFC opinions, the Appeals Council explained that it still would have remanded based upon legal error at Step 5 of the sequential analysis, because the ALJ "based his finding that the claimant could perform jobs that exist in significant numbers in the national economy" on vocational expert testimony that was

based on the same document that the ALJ provided to the medical expert "as initialed by the medical expert" (citing the ALJ's decision at 17-18) rather than the ALJ's *own* determination of the Plaintiff's RFC.  Under the regulatory guidelines, it is the ALJ and not the medical expert who has the responsibility to determine a claimant's residual functional capacity.  (Tr. 231).   This is more than a formalistic legal requirement.  While the ALJ often bases his/her RFC determinations on the opinions offered by medical experts, the ALJ should not direct an ME's medical opinion.  Likewise, the ALJ should not ask a single consulting expert to actually determine the final RFC, as ALJ Sheard erroneously did at the first hearing.

ALJ King began her analysis of Dr. Buban's testimony by pointing out that despite the infirmities of ALJ Sheard's analysis at Steps 4 (in having the ME determine Plaintiff's RFC) and at Step 5 of the sequential analysis (which compounded the error by asking the VE to use the same improper RFC form), the Appeals Council did not find any fault with ALJ Sheard's analysis through Step 3.  ALJ King then reasoned that ALJ Sheard's analysis through Step 3, including that relating to Plaintiff's mental health limitations, was persuasive.  She noted that ALJ Sheard "provided a strong analysis of the medical expert's testimony regarding the 'Paragraph B' [criteria]," and that Dr. Buban had supported that testimony with "specific citations to the record that *are still relevant* and demonstrate that 'marked' findings are not warranted."  (Tr. 21, emphasis added).  ALJ King pointedly found that the submission of evidence for the final six months of the alleged disability period, after ALJ Sheard's March 2013 decision up to through the September 2013 DLI, "does not demonstrate a substantial worsening in the claimant's mental state during the period at issue to the extent that 'marked' limitations are warranted." (*Id.*)   Instead, ALJ King emphasized that most of that evidence and

Plaintiff's testimony at the March 2015 hearing "focused on her current state and not her issues prior to the date last insured." (Tr. 27).

Plaintiff does not point to any errors in Dr. Buban's testimony other than those noted in the Appeals Council's remand order. In terms of the paragraph B criteria at Step 3, Dr. Buban testified that Plaintiff has only mild restriction in her activities of daily living, and moderate restrictions in other functional areas. ALJ King gave Plaintiff "some additional benefit of the doubt" by finding her more limited than endorsed by Dr. Buban in her daily activities, but still determined that Plaintiff had "no more than moderate" restrictions in her activities of daily living, social functioning, and in concentration, persistence or pace. (Tr. 21).

Turning more specifically to Plaintiff's mental RFC assessment at Steps 4 and 5, ALJ King explained at some length why neither the record or medical opinion evidence, nor Plaintiff's testimony, supported greater limitations. ALJ King restricted Plaintiff to "simple, routine, and predictable tasks," with only "occasional verbal communication" and "no constant production rate pace work," interactions with the public limited to "approximately 10% of the workday," with "no transactional interaction such as sales or negotiations," and only occasional interactions with coworkers and supervisors, with no tandem tasks, and no situations where she needs to resolve conflict or maintain a friendly or persuasive demeanor. (Tr. 23).

With respect to Dr. Buban, ALJ King described her testimony as follows:

> Among other things, Dr. Buban explained that the medical record demonstrated a gradual improvement in mental symptomatology from the alleged onset date through August 2012. Dr. Buban further testified that beginning in August 2012, the mental treatment record showed marked improvement in the claimant's mental symptoms. She further explained that the claimant's academic records and demonstrated adaptive functioning was not suggestive of borderline intelligence and that the low

IQ scores appeared to be underestimates of the claimant's cognitive ability.

Dr. Buban's testimony is consistent with mental health treatment records and does not suggest that long-term work preclusive restrictions were needed during the period at issue. For example, in June 2012, Ms. Cline, a counselor at Solutions, referred to rather benign clinical findings and also assessed a GAF score of only 55, which is suggestive of moderate level symptoms and not typically associated with disabling mental limitations.

(Tr. 27-28).

In formulating Plaintiff's RFC, ALJ King made abundantly clear that she was not relying on any of the improperly solicited and adopted RFC opinions expressed on the form that Dr. Buban had completed at the first hearing at ALJ Sheard's request.

While the undersigned completely rejects the form Dr. Buban completed at the request of the prior [ALJ], Dr. Buban's testimony is still relevant and persuasive. Her testimony strongly suggests that the claimant could not understand, remember, or carry out complex job instructions. Her testimony also supports the incorporation of several additional restrictions designed to accommodate reduced stress tolerance, cognitive difficulties, and problems around others. Dr. Buban's concerns, while certainly significant, have been fully addressed….[in the ALJ's RFC]."

(Tr. 29). The ALJ pointed out that she included "rather substantial social restrictions in a much stress-reduced environment," emphasizing "that neither Dr. Buban's testimony nor the claimant's relatively conservative mental health treatment during the period at issue support total work preclusion." (Tr. 30).

The undersigned agrees with the Commissioner that the ALJ's limited reliance on Dr. Buban's earlier testimony at the first hearing and "carve-out" of the improper RFC form, does not constitute reversible error. The testimony cited by the ALJ simply was not infected with the primary legal errors that led the Appeals Council to remand. (*See generally* Tr. 72-78).

### ii. Treating Physician Dr. Cerullo

Plaintiff's related assertions of error concerning the evaluation of other medical opinions are equally unavailing. For example, Plaintiff relies heavily on the "powerful, limiting medical opinions" of treating physician Dr. Cerullo. However, a treating physician's opinions are controlling only to the extent that they are well-supported and not inconsistent with other substantial evidence of record. Dr. Cerullo did not even begin to treat Plaintiff for her mental impairments until long after her DLI, in 2015. (Tr. 1437, 1500). Although he opined in July 2015 that Plaintiff had a disabling level of limitations because she would miss at least 4 days of work per month and would be significantly off-task, (Tr. 1502-1504), his opinions do not pertain to the relevant disability period, and were not supported by any evidence prior to Plaintiff's DLI.

ALJ King gave "little weight" to his opinions because they were rendered "nearly 2 years after the date last insured" with no treatment by Dr. Cerullo during the relevant period. (Tr. 31). The ALJ found his opinions not to be entitled to controlling weight because they were "inconsistent with the medical evidence of record for the period at issue, which, as persuasively explained by Dr. Buban at the first hearing, demonstrates progressive improvement in mental symptoms during essentially the entire period at issue." (Tr. 31). ALJ King acknowledged the apparent downturn and "worsening mental symptoms" reflected in Dr. Cerullo's later records, but reiterated that the referenced downturn did not occur prior to September 30, 2013, even as reported by Plaintiff herself. (*See e.g.* Tr. 128-129, 139). Therefore, the ALJ found Dr. Cerullo's opinion to "warrant[] limited weight due to its lack of relevancy for the period at issue." (*Id.*)

I find no legal error. A treating physician's opinion rendered after the DLI "may be considered to the extent [that] it illuminates a claimant's health before the expiration

of his insured status." *Nagle v. Com'r of Soc. Sec.*, 191 F.3d 452 (6th Cir. 1999). "However, to be given significant weight, this retrospective opinion must be supported by relevant, objective evidence that was contemporaneous to the insured period." *Stark v. Com'r of Soc. Sec.*, 2016 WL 1077100, at *6 (N.D. Ohio March 18, 2016), citing *Strong v. Soc. Sec.*, admin., 88 Fed. Appx. 84`1, 845 (6th Cir. 2004). Contrary to this, Dr. Cerullo's own treatment records reflect a downturn that began in 2015, based upon triggering events that included family and financial stressors *after* her DLI. (Tr. 31). *See also generally Dillon v. Com'r of Soc. Sec.*, 2012 WL 5878872 at *11 (S.D. Ohio Nov. 21 2012), adopted 2012 WL 6212858 (S.D. Ohio Dec. 13, 2012)(finding no error where ALJ gave greater weight to consulting physicians, where treating physician did not begin treatment until two years after DLI and his opinion was not reflective of claimant's limitations prior to the DLI).

### iii. Examining Psychologist Dr. Scott

Plaintiff also argues that the ALJ should have given more weight to portions of two opinions by Dr. Scott, an examining psychological consultant. In assessing Plaintiff's work-related mental abilities, Dr. Scott opined that Plaintiff's "mental ability to withstand the stress and pressure associated with day-to-day work activities is markedly impaired by [Plaintiff's] emotional difficulties." (Tr. 748; *see also* Tr. 843). Dr. Scott further opined that Plaintiff's "attention and concentration skills were marginally adequate during this evaluation and may deteriorate altogether over extended time periods, slowing her performance in completing simple repetitive tasks. Further, her persistence and pace in task completion will be affected by her anxious and depressive symptomology." (Tr. 748, 843). The latter limitation is arguably fully accommodated by

the RFC determined by ALJ King, but the ALJ rejected the more work-preclusive "markedly impaired" ability to handle the stress and pressure of day-to-day work.

Plaintiff accuses ALJ King of rejecting Dr. Scott's opinions "[w]ithout pointing to specific evidence," and "without *any* reasoning or explanation." (Doc. 12 at 14, emphasis added, citing Tr. 22). However, ALJ King explained in detail why she was giving only "some weight" to the July 31, 2010 and July 2, 2011 opinions of Dr. Scott.

> She referred to diagnoses of bipolar disorder and PTSD. Based on her observations, Dr. Scott referred to a variety of expected issues at the workplace secondary to mental and emotional difficulty including problems relating to others, difficulty performing more than simple tasks, problems responding appropriately to work-related stresses, and difficulty maintaining concentration/attention…. Depending on the report, Dr. Scott indicated that such difficulties ranged between the moderate to marked range of severity, although she consistently referred to GAF scores indicative of moderate level mental symptomatology and her actual clinical findings during these evaluations did not significantly differ in nature or quality and suggest retained skills inconsistent with total work preclusion and adequately addressed by the residual functional capacity…. Moreover, the undersigned finds that the overall evidence supports no more than moderate functional limitations in the four broad areas, as determined by the State agency. Furthermore, an administered WAIS-IV in July 2010 showed scores ranging from the high 60s to low 80s, but Dr. Scott cautioned that these results were likely an underestimate of the claimant's true cognitive abilities, as she appeared to have low average intelligence…. Dr. Scott not referring to any diagnoses on Axis II and her GAF score above 50 further reinforces this relatively high degree of cognitive functioning. The observations and opinions of Dr. Scott support the non-exertional limitations included by the undersigned in the above residual functional capacity.

(Tr. 30). The ALJ's analysis of Dr. Scott's RFC opinions is supported by substantial evidence in the record as a whole. As the ALJ pointed out, Dr. Scott assessed a Global Assessment of Functioning ("GAF") score of 52 in 2010, and a slightly improved score of 53 in 2011, both of which represent only "moderate" symptomatology. (Tr. 30, citing Tr. 747, 843). ALJ King appropriately found the most extreme limitations assessed by

Dr. Scott were not consistent with other substantial record evidence that showed improvement during the period at issue. (Tr. 30).

In an effort to counter that evidence of improvement, Plaintiff argues that the opinions of Dr. Scott and Dr. Cerullo taken together with the additional mental health treatment records submitted to ALJ King prove that Plaintiff's "improvement … in the last half of 2012 was illusory," and that Plaintiff's symptoms both existed and persisted at a disabling level. Plaintiff refers to Exhibits attached to the Statement of Errors, particularly Exhibit C,[6] in which counsel summarizes favorable evidence submitted after the first hearing. For instance, she cites to a March 18, 2013 record (discussed below) at which her treating psychiatrist observed increased symptoms. (Tr. 1207-1208).

Plaintiff also describes the ALJ's reference to recent "acute stressors" as a "glib characterization of the stressful life that most mentally ill, indigent, disabled persons endure regularly by virtue of their illness and circumstances." (Doc. 12 at 15). However, the ALJ's reference directly corresponded with Plaintiff's testimony at the second hearing about stressors that did not occur until *after* her DLI, including her daughter living with Plaintiff with her five month old baby and getting pregnant with a second child, being threatened with eviction due to disruptive houseguests who had moved in with Plaintiff around Thanksgiving of 2014 with four children and stayed until February 2015, recent concerns about the living conditions of the apartment, and her son having gone to rehab. (Tr. 128-133). Thus, the ALJ's description of the record was substantially supported and explained the conclusion that Plaintiff's downturn occurred after her DLI.

---

[6]The undersigned has reviewed these exhibits as additional argument, as such summaries are not part of the administrative record that was before the ALJ, and cannot be otherwise considered by this Court.

### iv. Treating Psychiatrist Dr. Heather

The March 18, 2013 record cited by Plaintiff reflects medication changes made by Dr. Heather due to an uptick in symptoms, but the record of improvement in Plaintiff's symptoms prior to that appointment is well supported. Moreover, Dr. Heather's March 2013 clinical note does not demonstrate a *disabling* level of increased symptoms. The note reflects that Plaintiff presented as "calm," and despite increased depression, she reported no suicidal ideation. She reported being "excited about her daughter," and Dr. Heather described her as being "very insight[ful]," with "good judgment." (Tr. 1207). In addition, Dr. Heather's follow-up record in June 2013 confirms milder symptoms and that Plaintiff was "stable" and "doing well," reflecting an effective medication adjustment. (Tr. 1204-1205). Notably, all other records referenced by Plaintiff as evidence of a downturn in her symptoms post-date the expiration of Plaintiff's insured status. However, even shortly after the expiration of Plaintiff's DLI, in December 2013, Plaintiff's therapist observed no overt signs of psychosis, a euthymic mood, only mild anxiety, and appropriate behavior. (Tr. 31, citing Tr. 1201).

The ALJ discussed many of Dr. Heather's records including his initial diagnosis of schizoaffective disorder on June 20, 2011, and reference to substantial functional deficits.[7] (Tr. 919-921). As the ALJ pointed out, Dr. Heather's diagnosis was "not supported by his treatment records, the claimant's testimony, the testimony of Dr. Buban, or any other treating physician." (Tr. 30). In addition, Dr. Heather's RFC opinions were internally inconsistent in multiple ways (Tr. 31), and he ultimately

---

[7]In her Statement of Errors, Plaintiff discusses only Dr. Heather's March 2013 clinical note, and does not make any claim concerning his June 2011 opinions. The undersigned has included brief discussion of those opinions solely in the interest of completeness.

concluded that Plaintiff may be able to work full-time "in a low stress, simple type job, such as busing dishes, light custodial work, or bagging groceries." (Tr.921).

### v. Medical Opinions by Three State Psychologists

In her final complaint about the ALJ's evaluation of the medical opinion evidence, Plaintiff argues that the ALJ relied too much on "early reports from nonexamining state agency doctors who rendered their opinions in 2009 through 2011." (Doc. 12 at 13, citing Tr. 22). Plaintiff argues that it was error for ALJ King to rely on those opinions because the consultants lacked access to later treatment records, and the ALJ failed to acknowledge that fact. *See Blakley v. Com'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)(holding that when an ALJ relies on a non-examining consultant who has not considered the full record, the ALJ's opinion should reflect that she "at least considered [that] fact").

The undersigned finds no *Blakley* error. The ALJ appropriately cited to the record, including the fact that the most recent of the three consulting opinions was rendered nearly two years prior to the expiration of Plaintiff's insured status on November 18, 2011, by Dr. Voyten. (Tr. 22). All three consulting psychologists found that Plaintiff could perform 2-3 step tasks, with only occasional and superficial interaction with others, in routine and predictable settings, without expectations of adherence to strict time limits or production standards, and not involving situations in which she would need to resolve conflicts or maintain  a friendly or persuasive demeanor. (Tr. 177-178, 195-196). The ALJ expressly noted that despite their relatively early dates, the opinions "are consistent in general with the evidence of record for the period at issue [through September 30, 2013], including evidence obtained since the remanded decision." (Tr. 30; *see also generally* Tr. 17-23). Moreover, ALJ King

added more mental limitations in Plaintiff's RFC, including "an even greater reduced stress environment with fewer social expectations than described by these various consultants" in order to "better address the claimant's demonstrated mental state during the period at issue." (Tr. 30).

### 3. Evaluation of Panic Disorder and Migraine Headaches at Step 2 of the Sequential Analysis

As her final claim, Plaintiff argues that the ALJ failed to address her anxiety/panic attacks and migraine headaches "as severe impairments." (Doc. 12 at 16). Essentially, Plaintiff is claiming reversible error at Step 2 based upon the ALJ's failure to classify these two impairments as "severe." When an ALJ identifies certain severe impairments and proceeds beyond Step 2 of the sequential analysis, the fact that the ALJ omitted one or more "severe" impairments at Step 2 typically will not provide grounds for reversal. *See generally Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987). I find no reversible error on the record presented.

ALJ King expanded the list of severe mental and physical impairments compared to those listed by ALJ Sheard, which were limited to "diabetes mellitus, low back strain agitated by claimant's obesity, obesity, Morton's neuroma, and bipolar disorder until August 1, 2012." (Tr. 206). By contrast, ALJ King found "[d]epression, bipolar disorder, posttraumatic stress disorder (PTSD), intermittent explosive disorder, borderline intellectual functioning, obesity, diabetes, osteoarthritis, and hernia." (Tr. 20). In his opening statement before ALJ King, counsel referred to "page two of my prehearing memo" as listing his client's severe impairments. The referenced list includes depression and psychosis and bipolar disorder, as well as migraine headaches, but does not include anxiety or panic disorder. (Tr. 579). Counsel verbally articulated similar impairments, listing "recurrent depression and psychosis severe…bipolar two, as

26

well as prediabetes, morbid obesity, migraine headaches, fibromyalgia, and intellectual disability. (Tr. 115). In his prehearing memorandum and at the hearing, counsel primarily advocated for a finding of "mild MRDD" based on her intellectual functioning.[8] Counsel never referred to panic attacks or an anxiety disorder, although he briefly alluded to symptoms of "paranoia" and "isolation" while discussing the effectiveness of medications that have eliminated "a lot of the aggression and a lot of the hallucinations and things…" (Tr. 116).

Arguably, any claim that Plaintiff suffers from the severe impairment of either anxiety or "panic disorder" at Step 2 was waived at the hearing level. However, to the extent that the record contains any evidence of that disorder prior to Plaintiff's DLI, the ALJ adequately discussed any associated limitations.[9] ALJ King specifically found and discussed Plaintiff's post-traumatic stress disorder as a severe "anxiety-related impairment." (Tr. 20). In addition, her opinion states that she found "sufficient evidence exists to establish a severe anxiety-related impairment and a cognitive impairment along with her mood disorder," but one that was short of the criteria required to meet a listing level impairment. (Tr. 21-22). The ALJ noted that Plaintiff's testimony about her "current state" after her DLI reflected "ongoing problems with anxiety and depression." (Tr. 27). ALJ King also reviewed Plaintiff's symptoms under Listing 12.06 for all anxiety-related impairments, even though at the hearing Plaintiff's counsel referenced only Listings 12.03 and 12.04, describing a "schizophrenic, psychosis-type listing [as]…her primary diagnosis." (*Compare* Tr. 21-22 with Tr. 117). Finally, ALJ King referenced

---

[8]Plaintiff has not appealed the ALJ's conclusions that she did not meet that listing, nor has she appealed the determination that she did not suffer from fibromyalgia, or psychosis as a severe impairment.
[9]Plaintiff testified that she was not prescribed Valium for her "panic attacks" until a year before the hearing (after her DLI). In 2015, she testified that she takes her Valium when she feels a panic attack coming on, but not every day or even every night, only when she needs it. (Tr. 139).

Plaintiff's complaints of panic attacks as well as other medical evidence regarding her anxiety when she assessed her RFC. (Tr. 27-28, 31). In short, Plaintiff has failed to identify any way in which the ALJ's failure to include "panic disorder" at Step 2 would warrant reversal or require any additional limitations in Plaintiff's mental RFC beyond those determined.

Similarly, there is no basis for reversal due to the ALJ's failure to list migraine headaches at Step 2. In context, Plaintiff had claimed that a severe impairment of fibromyalgia as well as migraines, based on records from her primary care physician, Dr. Bain. ALJ King first explained why she did not find medical evidence to support a diagnosis of fibromyalgia. After discussing the limited "one-time reference" in Dr. Bain's records to the "poorly supported" diagnosis of fibromyalgia, which did "not establish this condition [fibromyalgia] as a medically determinable impairment," the ALJ observed that "[t]he same can be concluded for Dr. Bain's one-time reference to migraines." (Tr. 25). With respect to the migraine evidence, ALJ King wrote:

> The claimant has very little, if any, specialized treatment for this condition and the record does not contain any objective findings verifying chronic headaches or even detailed descriptions provided by the claimant of …her migraine symptoms, causes, or after effects. This lack of supportive evidence fails to establish this condition as a medically determinable impairment as medical signs and laboratory findings, established by acceptable clinical or laboratory techniques, must show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities and that can reasonably be expected to produce the pain or other symptoms alleged. In the absence of any medical signs or laboratory signs, the Administrative Law Judge finds that the claimant's allegations of headaches and Dr. Bain's reference to migraines do not represent a medically determinable impairment.

(Tr. 25).

In January 2013, Plaintiff testified that she had suffered from migraines for approximately 8 years (a date well before her alleged onset of disability), that she takes

Inderel and Excedrin Migraine, that her medication is generally effective and she feels better after an hour or two. (Tr. 67-68). She testified that two years prior, she only had migraines once per month but that Dr. Bain had recently increased her medication due to an increase in the frequency of her headaches. (Tr. 68). At the second hearing in March 2015, long after her DLI, Plaintiff testified to "probably" two headaches per month due to sinuses and stress. (Tr. 130). Aside from the relevancy of dates, ALJ King discredited Plaintiff's testimony regarding her limitations, including her complaints of pain due to migraines, finding that her alleged symptoms were "not nearly as limiting as she has alleged." (Tr. 26).

Plaintiff argues that ALJ King committed reversible factual error by referring to the evidence of migraine headaches as a "one-time" occurrence in Dr. Bain's records, because her records include a handful of additional references at Tr. 616, 790-795, 1060, 1066-67. Having examined all of the referenced records, the undersigned finds any factual misstatement of the record to be minor and harmless. The referenced records are computerized annotations that appear copied from one record to the next, and include migraines on a list of "chronic problems." The first record (Tr. 616), dated August 2008, lists Plaintiff's medications for migraines at an initial office visit establishing care. However, the record reflects no descriptions, or laboratory findings, or any evidence at all regarding the frequency, severity of symptoms, or effectiveness of medications. Nearly all of the records similarly contain only the most cursory references to "migraines" dating to 2010 on Plaintiff's list of "chronic problems." (Tr. 790-795, 1060). Only one record, dated March 30, 2012, contains any report of ongoing symptoms. In that record, Plaintiff complained more of back pain, and described only "some headache but mild." (Tr. 1066). Thus, substantial evidence supports the ALJ's

29

decision not to impose any additional limitations based upon Plaintiff's alleged migraines.

### III. Conclusion and Recommendation

It is the Plaintiff who retained the ultimate burden of proving that she became disabled prior to September 20, 2013. *See Born v. Sec'y of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). The undersigned acknowledges, as did ALJ King, that some evidence in the record supports that Plaintiff suffered a downturn in her symptoms in recent years, particularly since beginning treatment with Dr. Cerullo. To the extent that Plaintiff's records would support a new claim for SSI, she remains free to file such an application if she has not already done so. However, because Plaintiff did not file a contemporaneous SSI application, this judicial appeal is limited in scope to a determination of whether substantial evidence supports the Commissioner's denial of her April 2011 DIB application, due to her failure to demonstrate that she became disabled on or before her date last insured, September 30, 2013.

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's DIB decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

30

SARAH CHINA MORGAN,                     Case No. 1:17-cv-107

        Plaintiff,                     Black, J.
                                     Bowman, M.J.
    v.


COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).